D/F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
NICHOLAS G. PETRIS,

              Plaintiff,

    - against -

JO ANNE B. BARNHART,
Commissioner of Social Security,

              Defendant.
--------------------------------------------------X

MEMORANDUM AND ORDER
05-CV-4014 (NGG)

GARAUFIS, District Judge

Nicholas Petris ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) to

challenge a final determination of Jo Anne B. Barnhart, Commissioner of Social Security

("Commissioner"), denying his application for Social Security disability benefits. The court now

considers cross-motions for judgment on the pleadings. For the following reasons, Plaintiff's

motion is GRANTED, Commissioner's motion is DENIED, and the case is REMANDED for the

Commissioner to address the issues set forth below.

I.      BACKGROUND

    A.    **Procedural History**

Plaintiff filed an application for disability benefits on September 12, 2000, alleging that

he could no longer work as of March 31, 2000, due to pain and limited range of motion in his

back, arms, and shoulders. (Record ("Rec.") at 74, 76.[1]) Plaintiff's claim was denied by the

Commissioner both initially and upon reconsideration. (Id. at 56-59, 61-64.) Plaintiff requested

a hearing before an Administrative Law Judge ("ALJ"), which was held on December 5, 2001,

---

[1] "Rec." refers to the record filed with this court by the Commissioner. It contains transcripts of
hearings, ALJ rulings, and exhibits.

by ALJ David Nisnewitz. (Id. at 322.) In a decision dated February 5, 2002, ALJ Nisnewitz found Plaintiff not disabled. (Id. at 29.) On May 20, 2002, the Appeals Council ("Council") granted Plaintiff's request to review the ALJ's decision and remanded the case for further administrative proceedings. (Id. at 211.) On September 19, 2002, ALJ Nisnewitz ordered Plaintiff to undergo consultative examinations. (Id. at 359, 361.) On December 15, 2003, after those examinations were conducted, a supplemental hearing was held. (Id. at 364.) Plaintiff, Dr. Ernest Abeles (a medical expert), and Andrew Pasternak (a vocational expert) testified at the supplemental hearing. (Id. at 366.) On February 24, 2004, ALJ Nisnewitz denied Plaintiff's claim, finding that Plaintiff was capable of performing light work. (Id. at 23.) This determination became the final decision of the Commissioner on August 2, 2005, when the Council denied Plaintiff's request for review. (Id. at 5.)

Plaintiff timely commenced this action on August 23, 2005. 42 U.S.C. § 405(g) (providing that an action must be commenced within sixty days of, or such time as the Commissioner may allow after, receiving notice of an unfavorable decision).

### B. Plaintiff's History

#### 1. Background

Plaintiff was born in Greece on January 2, 1950. (Rec. at 74.) He immigrated to the United States in 1969. (Id. at 326.) Plaintiff testified that he received a sixth-grade education in Greece and was employed as a unionized painter for thirty years. (Id. at 329-30.) His previous job as a painter was rated by the Social Security Administration as involving a medium level of physical exertion.[2] (Id. at 411.)

---

[2] Medium-exertion work involves "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

2

## 2.    Medical Evidence

Plaintiff started to receive medical treatment through the New York State Workers'

Compensation Fund ("workers' compensation") after suffering an unspecified back injury at

work on April 4, 1998. (Pl. Br. at 2.)  Plaintiff was treated by Dr. Irina Gifford between

November 12, 1998, and February 11, 1999.  (Rec. at 135-38.)  On October 9, 2000, Dr. Gifford

filed a report diagnosing Plaintiff with lumbar myofascial pain syndrome, right shoulder

tendinitis, and a cervical herniated disc with C5-6 radiculopathy.  (Id.)  She reported that

Plaintiff complained of lower back and shoulder pain and weakness in the lower extremities.  (Id.

at 136.)  Dr. Gifford noted that Plaintiff's gait was not significantly abnormal.  (Id. at 139.)

Plaintiff was able to elevate his right shoulder 150 degrees and abduct it 140 degrees.  (Id.)  He

was able to elevate and abduct his left shoulder 160 degrees.[3]  (Id.)  Plaintiff also had a normal

range of motion in the cervical and lumbar spine.  (Id. at 140.)  While under Dr. Gifford's care,

Plaintiff received physical therapy three times a week at the Queens Center for Pain

Management.  (Id. at 135, 121-29.)  Dr. Gifford stated that she could not provide a medical

opinion regarding Plaintiff's ability to perform work-related activities.  (Id. at 137.)

On November 17, 1998, Plaintiff underwent an MRI of the lumbosacral and cervical

spine.  (Id. at 142-43.)  Dr. Eric Lubin, a board certified radiologist, noted that Plaintiff had

posterior bulging discs at L1-2, L2-3, L3-4, and L4-5, all of which deformed the anterior margin

of the thecal sac.  (Id. at 142.)  He also noted an intravertebral disc herniation within the L3-4

interspace as well as straightening of the cervical lordosis.  (Id. at 142-43.)  He observed a

posterior central and right lateral herniated disc at C3-4, which were deforming the anterior

---

[3] Normal elevation and abduction for shoulder raising is 150 degrees.  (Rec. at 139.)

3

margin of the spinal cord and effacing the right C4 neural foramen. (Id. at 143.) There were also concentric bulging discs at C4-5 and C5-6, which were deforming the anterior margin of the spinal cord. (Id.)

On June 24, 1999, Dr. Theodore Giannaris, an orthopedic surgeon, examined Plaintiff. (Id. at 129-34.) Plaintiff reported neck and lower back pain, which was aggravated by bending and lifting, and weakness and pain radiating to his thighs. (Id.) In a report dated September 27, 2001, Dr. Giannaris diagnosed Plaintiff with a herniated disc at C3-4, bulging discs at C4-5 and C5-6, a herniated lumbar disc at L3-4, and bulging discs at L1-2 and L4-5. (Id.) Dr. Giannaris stated that he could not provide a medical opinion regarding Plaintiff's ability to perform work-related activities. (Id.)

On January 19, 2000, Plaintiff began seeing Dr. Emmanuel Lambrakis, a general surgeon. (Id. at 105.) Dr. Lambrakis advised Plaintiff to immediately stop working as a painter. (Id.)

On March 17, 2000, Dr. Lambrakis again examined Plaintiff. (Id.) He noted that Plaintiff was suffering from "very severe chronic and debilitating illness related to his employment as a professional painter." (Id.) Dr. Lambrakis stated that over the past several months, Plaintiff had been suffering from severe pain, range-of-motion restrictions, and an inability to lift, extend, push, or pull any significant weight. (Id.) He observed that Plaintiff was suffering from bilateral shoulder derangement and severe cervical and lumbar radiculopathy, which caused Plaintiff to be "totally disabled." (Id.) Once again Dr. Lambrakis recommended that Plaintiff stop his work activities.[4]

---

[4] Due to concern over his financial situation Plaintiff continued to work until March 31, 2000. (Id. at 105, 144.)

4

Dr. Lambrakis also observed that Plaintiff complained of severe pain and required assistance getting onto the examining table. (Id. at 105.) Plaintiff's range of motion in the cervical spine was greatly limited and there was significant muscle spasm in the area. (Id. at 106.) Plaintiff also had extreme pain in his right shoulder and his range of motion was very limited. (Id.) Plaintiff also had severe pain in his left shoulder, though its range of motion was slightly better. (Id.) Dr. Lambrakis also noted that Plaintiff had a "progressively-worsening" and severe deformity on his left hand that left the fourth and fifth fingers in constant flexion and unable to fully extend. (Id.) Plaintiff noted that his left hand caused him severe pain, and that he his ability to grip was limited. (Id.) Dr. Lambrakis noted that Plaintiff's grasping strength was ninety pounds for the right hand and sixty pounds for the left. (Id.) He again advised Plaintiff to stop working and recommended that he undergo physical therapy at least four times a week. (Id. at 107.) Dr. Lambrakis prescribed Vicodin, Flexeril, and Prevacid. (Id.) He also referred Plaintiff to a gastroenterologist for a possible hiatal hernia. (Id.) Dr. Lambrakis concluded that Plaintiff was "totally debilitated" and unable to be gainfully employed. (Id.)

At the request of the Social Security Administration, Dr. Mohammad Khattak, an orthopedist, examined Plaintiff on October 11, 2000. (Id. at 118.) He observed that Plaintiff had a full range of motion and no muscle spasm in the cervical or lumbosacral spine and an that X-ray of the lumbosacral spine revealed only "minimal osteoarthritis." (Id.) Dr. Khattak diagnosed Plaintiff with degenerative arthritis in the right shoulder. (Id. at 119.) He concluded that Plaintiff had mild restrictions in his ability to bend, lift, and reach with his right arm, and no limitations sitting, standing, walking, carrying, or with gross and fine manipulations with his hand. (Id.) Dr. Khattak noted that Plaintiff did not need assistive devices for ambulation. (Id.)

On October 13, 2000, Plaintiff was again examined by Dr. Lambrakis, who made a diagnosis similar to that based on his examination of March 17, 2000. (Id. at 144.) He noted that Plaintiff stopped working on March 31, 2000, after his shoulder "gave in." (Id.) An endoscopy revealed that Plaintiff had a severe hiatal hernia with gastro-esophageal reflux that required extensive medication and possible surgery. (Id.) Dr. Lambrakis observed that Plaintiff still had a very limited range of motion in the cervical spine. (Id. at 145.) Plaintiff's right shoulder mobility was extremely limited, the paraspinal muscle groups were very tense, and both sciatic notches were painful and swollen. (Id.) Dr. Lambrakis also noted that the lumbar spine was extremely painful below the L2 level. (Id.) He advised Plaintiff to continue physical therapy at least three times a week and prescribed Vicodin, Flexeril, and Prevacid. (Id.) Dr. Lambrakis once again concluded that Plaintiff was totally debilitated and unable to perform physical activity. (Id. at 146.)

On November 9, 2000, Dr. J. Pauporte, a non-examining state agency medical consultant, completed an assessment regarding Plaintiff's residual functional capacity ("RFC"). (Id. at 147.) Dr. Pauporte indicated that Plaintiff could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for six hours and sit for six hours in an eight-hour workday, and push or pull up to twenty pounds. (Id. at 148.) He noted that Plaintiff was limited in reaching and could occasionally engage in postural activities. (Id. at 149.) Dr. Pauporte questioned Dr. Lambrakis's conclusion that Plaintiff was completely disabled. (Id. at 153). Dr. Lambrakis never responded to Dr. Pauporte's request for additional medical evidence to support his conclusion. (Id.) Dr. Pauporte concluded that, despite some limitation for overhead reaching with his right arm, Plaintiff could perform light work. (Id.)

At the request of Plaintiff's insurance company, Dr. Milton Smith, an independent

orthopedic surgeon, examined Plaintiff on February 26, 2001. (Id. at 187.) Dr. Smith noted that

Plaintiff was not in acute distress and had a full range of motion and no tenderness in his neck.

(Id. at 189.) Dr. Smith observed that Plaintiff had no motor or sensory defects in the upper

extremities and that his biceps and triceps reflexes were bilateral and equal. (Id.) He observed

that Plaintiff had full range of motion and no pain in either shoulder. (Id.) An examination of

Plaintiff's knees revealed no redness or swelling and each knee was brought through the full

range of motion without difficulty or instability. (Id. at 189-90.) Dr. Smith diagnosed Plaintiff

with multiple sprains with lumbar radiculopathy that caused a mild limitation. (Id. at 190.) He

concluded that Plaintiff could return to work as long as he did not do any heavy lifting. (Id.)

On March 2, 2001, Dr. Lambrakis again examined Plaintiff. (Id. at 177.) He noted that

Plaintiff suffered from the same severe limitations that he had observed during prior

examinations. (Id. at 177-79.) Dr. Lambrakis requested that Plaintiff undergo MRIs of both

shoulders and the cervical and lumbar spine. (Id. at 179.)

At the request of Plaintiff's insurance company, on April 30, 2001, Dr. Kenneth Falvo, an

orthopedist, examined Plaintiff. (Id. at 191.) Dr. Falvo observed that Plaintiff had a normal gait

and station and used no aid in ambulation. (Id. at 192.) Plaintiff rose from the sitting to standing

position and got onto the examination table without difficulty. (Id.) Plaintiff's cervical spine

had forty-five degrees of flexion and lateral bending, forty degrees of extension, eighty degrees

of bilateral rotation, and no tenderness or spasm. (Id.) Dr. Falvo reported that Plaintiff had a full

range of motion in his shoulders but felt pain on full extension and abduction and during right

external rotation. (Id.) Plaintiff suffered from a loss of pinprick sensation in the right hand in a

7

non-anatomic distribution and had no interosseous wasting. (Id. at 193.) Plaintiff was able to stand on his heels and toes and had no loss of pinprick sensation in the lower extremities. (Id.) Plaintiff also had no difficulty with straight-leg raising. (Id.) He had full range of motion in his hips, which were painless and stable. (Id.) Dr. Falvo diagnosed polyarthralgias and concluded that Plaintiff had a moderate disability. (Id.) He stated that Plaintiff should avoid prolonged standing and walking and should not lift more than twenty pounds on a routine basis. (Id.)

On May 25, 2001, Dr. Lambrakis again examined Plaintiff. (Id. at 182.) Plaintiff's range of motion in the cervical spine was extremely limited, with flexion, extension, and rotation of less than fifteen degrees. (Id. at 183.) Lateral flexion to the right and left were both less than five degrees. (Id.) Muscle spasm in the shoulders was very severe, with a range of motion of 90 degrees on the right and 120 degrees on the left. (Id.) He also recommended that Plaintiff, who had become very depressed as a result of his limitations, see a psychiatrist. (Id. at 184.) Dr. Lambrakis once again concluded that Plaintiff was completely and totally disabled. (Id.)

On August 13, 2001, Dr. Lambrakis again examined Plaintiff, gave a detailed recitation of Plaintiff's physical and psychiatric problems, and concluded that Plaintiff was completely and totally disabled. (Id. at 179-81.)

On November 19, 2001 Dr. Lambrakis completed a physical capacity evaluation of Plaintiff. (Id. at 185.) He reported that Plaintiff could not sit, stand, or walk for more than one hour during an eight-hour workday, could lift up to ten pounds occasionally, and could never bend, squat, crawl, or climb. (Id.) Dr. Lambrakis noted that Plaintiff would require three surgeries to fix his left shoulder and both knees and requested additional MRIs. (Id. at 263.)

On February 18, 2002, Dr. Lambrakis noted that an MRI taken of the cervical spine on September 24, 2001, demonstrated generalized bulges on C3-4 and C4-5 that were causing an indentation on the anterior subarachnoid. (Id.) A physical examination of Plaintiff revealed the same limited range of motion of the cervical and lumbar spine and the right shoulder. (Id.)

On February 19, 2002, Dr. Lambrakis completed a medical source statement. (Id. at 233.) Dr. Lambrakis noted that Plaintiff could sit for a total of two hours in an eight-hour workday, could stand or walk one hour, and required a cane when walking and standing. (Id. at 235.) He also noted that Plaintiff would need to recline or lie down in the supine position for three or four hours during an eight-hour workday. (Id.) Plaintiff could rarely or never lift less than five pounds, stoop, look down at a table or desk, look upward to the ceiling, or look sideways to the right or left. (Id.)

On June 12, 2002, and September 9, 2002, Dr. Lambrakis reported findings similar to those from February 18, 2002. (Id. at 243, 246.)

On October 8, 2002, Dr. Vaia Delidimitropulu, a psychologist, examined Plaintiff. (Id. at 291.) She observed that Plaintiff's speech was coherent and goal directed, that he was cooperative, and that he appeared somewhat sad but had no thought disorder. (Id. at 292.) Plaintiff's intellectual functioning appeared average and his social skills were appropriate, though he had some problems with short-term memory and concentration. (Id.) Dr. Delidimitropulu diagnosed Plaintiff with mood and anxiety disorders and with depressive features that interfered significantly with his everyday functioning. (Id. at 296.) She recommended a psychiatric consultation to assess the need for psychopharmacological intervention. (Id.)

9

On October 10, 2002, Plaintiff was examined by Dr. Agosto Moreano, a psychiatrist, at the request of the Social Security Administration. (Id. at 266.) Dr. Moreano reported that Plaintiff's speech was coherent and relevant, his mood calm, and his affect mildly anxious. (Id. at 267.) Plaintiff displayed no signs of delusions or hallucinations. (Id.) His orientation and memory were "good." (Id.) Plaintiff's concentration, insight, and judgment appeared adequate. (Id.) Dr. Moreano diagnosed Plaintiff with anxiety disorder and did not recommend further psychiatric treatment. (Id.)

On October 15, 2002, a consultative orthopedic examination was performed by Dr. Raymond Kurzner. (Id. at 271.) Dr. Kurzner noted that Plaintiff had fully recovered from his previously described subjective complaints of lower and cervical back, knee, and shoulder pain. (Id. at 276.) He noted no positive findings and indicated that Plaintiff had no limitations in lifting, carrying, standing, walking, sitting, pushing, or pulling. (Id. at 276.) Dr. Kurzner also questioned Dr. Lambrakis's assessment of Plaintiff's September 2001 MRIs. (Id. at 275.) He concluded that the bulging disc in the cervical MRI was a normal finding and saw no evidence in the shoulder MRI to support Dr. Lambrakis's diagnosis of acromioclavicular joint swelling or impingement. (Id.)

Dr. Kurzner also noted several inconsistencies during the examination, including (1) Plaintiff came in with a cane on the upper right extremity, shifted it to the right and left, and did not fully use it when entering the consult room, (2) Plaintiff had an inconsistent plantar gait, (3) Plaintiff was limited to thirty degrees of trunk flexion in a standing position but had full trunk flexion when tested in two other ways, (4) Plaintiff had inconsistent straight-leg raising, (5) Plaintiff was unable to fully extend his arms except when lifting one arm at a time, and (6)

Plaintiff had delayed reactions to pain. (Id. at 273.) Dr. Kurzner observed that Plaintiff's complaints were "very unusual" given the lack of a history of trauma. (Id. at 276.) He also questioned the necessity of the 2001 MRIs, writing that they were unwarranted other than by Plaintiff's subjective complaints. (Id.) He concluded that Plaintiff's problems were "resolved" and that he should be working full-time. (Id.)

On November 20, 2002, Dr. Robert Karlan, a neurologist, examined Plaintiff at the request of the Social Security Administration. (Id. at 283.) Dr. Karlan reported that Plaintiff had no objective neurological deficits and that his mental status was intact. (Id.) Plaintiff had no weakness or atrophy of the muscles and was easily able to put on his pants by standing on one leg. (Id. at 284.) Dr. Karlan also reported that Plaintiff was "hypersensitive" to pain testing on all parts of his body. (Id.) He noted that Plaintiff had a variety of abnormal laboratory results that failed to match Plaintiff's complaints. (Id.) In an RFC evaluation, Dr. Karlan noted that Plaintiff had no limitations lifting, carrying, standing, walking, sitting, pushing, pulling, or with manipulation; occasional limitations climbing, crouching, crawling, and stooping; could frequently balance, kneel, and lift up to twenty pounds; and could walk at least two hours a day. (Id. at 286-87.)

On December 18, 2002, Dr. Lambrakis once again noted that Plaintiff had extremely limited ranges of motion in his joints and was in severe pain. (Id. at 309-10.) He requested that Plaintiff get an MRI of his left shoulder and both knees. (Id.) Additionally, Dr. Lambrakis noted that Plaintiff told him that the independent orthopedic examiners did not actually examine him. (Id. at 309.) Plaintiff reported that neither doctor physically touched him and that they only asked him a few questions. (Id.) Plaintiff also told Dr. Lambrakis that only a "Dr. Zerisky"

11

actually examined him and that this doctor just "passively lifted" Plaintiff's shoulder.[5] (Id. at 310.) Dr. Lambrakis further claimed that the conclusions and test results submitted by Drs. Karlan and Kurzner were either "erroneous or belong to another patient and were mixed with [Plaintiff's records]." (Id.)

On June 18, 2003, Dr. Lambrakis examined Plaintiff. (Id. at 308.) He observed that Plaintiff's physical and psychological conditions were unchanged and still extremely poor. (Id.)

On September 17, 2003, Dr. Lambrakis diagnosed Plaintiff with a diaphragmatic hernia and prescribed Priolosac and Prevacid. (Id. at 306.) Dr. Lambrakis's assessment of Plaintiff's physical condition remained unchanged. (Id.)

On October 17, 2003, and November 11, 2003, Dr. Lambrakis examined Plaintiff and reported findings that were the same as his previous diagnoses. (Id. at 302, 304.) Plaintiff's examination revealed that his physical limitations and psychological problems remained unchanged since the last time he had examined Plaintiff. (Id.)

On November 4, 2003, Dr. Panagiotis Zenetos of Wyckoff Pain Management, examined Plaintiff. (Id. at 299.) Dr. Zenetos observed that Plaintiff was not in any apparent distress during the examination. (Id. at 300.) Motor strength on the right-side was 4/5 in the following areas: hip abductors and adductors, hamstrings, gluteal muscles, foot dorsiflexors and plantarflexors, hip external and internal rotators, quadriceps, and hip flexors. (Id.) Straight-leg raising was limited to fifty degrees on the right and sixty degrees on the left. (Id.) Dr. Zenetos

---

[5] The record does not indicate that Plaintiff was ever examined by a Dr. Zerisky, or even that such a doctor exists.

12

diagnosed possible lumbago, muscle spasm, lumbar radiculopathy, and joint pain of the knees and shoulders. (Id. at 301.) He requested MRIs of both knees. (Id.)

In a medical source statement completed in December 2003, Dr. Lambrakis concluded that Plaintiff could sit for less than fifteen minutes at a time, could not sit for more than two hours total in an eight-hour workday, could not stand or walk for more than fifteen minutes at a time or more than an hour total in an eight-hour work day, needed to lie down for four hours in an eight-hour workday, and could rarely or never lift more than five pounds. (Id. at 312-13.) He concluded that Plaintiff was unable to do any work. (Id. at 313.)

### 3. Expert Testimony

On December 15, 2003, Dr. Ernest Abeles testified as a medical expert. (Id. at 393.) Dr. Abeles testified that Plaintiff had chronic lumbosacral sprain. (Id.) He further testified that although Plaintiff complained of knee pain, there was no evidence in the record that his knees had been examined or treated. (Id. at 393-94.) Dr. Abeles testified that some of Plaintiff's examinations revealed a "small" limitation in the right shoulder but no evidence of cervical radiculopathy. (Id.) He noted that Plaintiff's 1998 MRI of the cervical spine included evidence of impingement upon the right exiting C4 nerve root, which could cause pain. (Id.) Dr. Abeles concluded that Plaintiff could perform light work and would be able to perform heavy work with three to six months of retraining and reconditioning. (Id. at 398-401.)

### 4. Vocational Expert

On December 15, 2003, Andrew Pasternak, a vocational expert, testified regarding Plaintiff's RFC. (Id. at 411.) Pasternak testified that Plaintiff's past job as a painter was a skilled job that required a medium exertional capacity. (Id. at 411.) He testified that Plaintiff

was skilled in selecting and mixing colors and textures and inspecting, skills that were transferable to other light and sedentary jobs. (Id. 411-17.) With these skills, Pasternak testified, Plaintiff could perform work as a masker or paint inspector, both of which existed in significant numbers in the local and national economies. (Id.) Pasternak also testified that based on Dr. Lambrakis's medical assessment, Plaintiff would be unable to perform a full range of either light or sedentary work. (Id. at 418.)

### 5. Plaintiff's Testimony

On December 5, 2001, at Plaintiff's first hearing, he testified that he stopped working on March 31, 2000, due to pain in his back, neck, and shoulders. (Id. at 332.) He also testified that trigger point injections he received at the Queens Center for Pain Management helped his shoulder for approximately two to three weeks. (Id. at 339.) Plaintiff testified that he could walk no more than two blocks at a time due to numbness in his feet and that he when he walked that distance he then needed to rest. (Id. at 346.) He testified that he avoided physical activity because it would increase his pain and that although he could lift up to ten pounds, he was not able to carry that weight without losing his balance. (Id. at 347.) Plaintiff testified that he was most comfortable when lying down and needed to lie down most of the day. (Id. at 349.) Plaintiff testified that after he stopped working, he spent two weeks in Florida, where he went in the water at the beach but was unable to swim. (Id. at 343-44.)

On December 15, 2003, at an additional hearing, Plaintiff testified that, during a typical day, he walked two blocks to get a newspaper and to the supermarket to pick up a light item; watched television; and read the newspaper. (Id. at 384-85.) He testified that the longest he could sit and watch television was one hour and that after sitting he needed to lie down. (Id. at

14

387-89.) Plaintiff testified that his pain was constant, that medications did not help, and that he could not sleep without taking sleeping medication. (Id. 388-90.) He also testified that he had difficulty using his right arm and hand. (Id. at 391.)

## II.   DISCUSSION

### A.   Standard of Review

A determination of disability made pursuant to 42 U.S.C. § 423 may be reviewed by a district court pursuant to 42 U.S.C. § 405(g). The reviewing function of a district court is limited: the district court may set aside the determination of the Commissioner only if the factual findings are not supported by substantial evidence or if the determination itself is based on legal error. Id.; see also Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000). It is the function of the Commissioner, not the reviewing court, to "resolve evidentiary conflicts and to appraise the credibility of the witnesses, including the claimant." Aponte v. Sec'y Dep't Health and Human Servs., 728 F.2d 588, 591 (2d Cir. 1984).

### B.   The Commissioner's Determination

When the Council denies a Plaintiff's claim, the Council's decision becomes the final decision of the Commissioner. 20 C.F.R. § 404.981. Eligibility for benefits under Title II of the Social Security Act is conditioned upon compliance with all relevant requirements of 42 U.S.C. § 423(c). A claimant is not entitled to benefits unless he is insured at the time he becomes disabled. Id. To be found disabled, a claimant must show an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months." Id. § 423(d)(1)(A). Additionally, an individual will be found disabled only if:

> [H]is physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

Id. § 423(d)(2)(A).

According to Social Security Administration regulations, an ALJ must use a five-step sequential analysis to determine whether a claimant qualifies as disabled. Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 1999) (citing 20 C.F.R § 404.1520(a)(4)). First, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. 20 C.F.R. § 404.1520(a)(4)(i), (b). Second, if the claimant is not gainfully employed, the Commissioner must determine if the claimant has a severe impairment that limits his ability to perform work-related activities. Id. § 404.1520(a)(4)(ii), (c). Third, if such an impairment exists, the ALJ must determine whether the impairment meets or equals the criteria of an impairment listed in Appendix 1 to 20 C.F.R. Pt. 404, Subpt. P ("Listing of Impairments"). Id. § 404.1520(a)(4)(iii), (d). Fourth, if the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity, as defined in Section 404.1545, to determine whether the impairment prevents the claimant from doing past work. Id. § 404.1520(a)(4)(iv), (e)-(f). Fifth, if the individual cannot perform past work, the ALJ must determine if the claimant's residual functional capacity prevents him from doing any other work. Id. § 404.1520(a)(4)(v), (g).

If the claimant satisfies all five requirements, the ALJ will find him disabled. The ALJ must consider "all evidence" in the case record. Id. § 404.152()(3). The claimant bears the burden of proof for the first four steps. Shaw, 221 F.3d at 131. If he satisfies his burden, the Commissioner then bears the burden of proof for the fifth step. Id. The Commissioner may satisfy that burden by showing that a claimant can perform other work in the national economy listed in the Medical-Vocational Rules Grids ("Grids"). The Grids "provide predeterminations of disability or non-disability for individual cases based on various combinations of residual functional capacity, age, education and work skill." Davis v. Shalala, 883 F. Supp. 828, 832 (E.D.N.Y. 1995).

The ALJ noted the findings of Dr. Lambrakis, Plaintiff's physical therapy records from the Queens Center for Pain Management, the consultative examinations of Drs. Khattak, Smith, and Falvo; and the medical assessments completed by state agency medical consultants, Drs. Pauporte and Buonocore. (Id. at 35-36.) He also detailed Plaintiff's subjective pain testimony. (Id. at 36.) After reviewing all of the evidence, ALJ Nisnewitz concluded that Plaintiff's restrictions were self-imposed and inconsistent with the medical evidence in the record. (Id.) He also specifically rejected the findings of Dr. Lambrakis, writing that Dr. Lambrakis's assessment of Plaintiff's RFC was significantly more limited that all other doctors and even Plaintiff's own testimony. (Id.) At the first step of the required sequential analysis, ALJ Nisnewitz denied Plaintiff's application for benefits because he found that Plaintiff had not performed substantial gainful work. (Rec. at 32, 33, 322.) At the second and third steps, ALJ Nisnewitz found that although though Plaintiff had a severe impairment, it was not severe enough to meet or equal a condition in Appendix 1 to 20 C.F.R. Pt. 404, Subpart P, Regulation

No. 4. (Id. at 34.) At step four, he concluded that Plaintiff did not have the residual functional capacity to perform past work as a painter. (Id. at 37.) At the fifth step, he concluded that Plaintiff had sufficient RFC to perform other work. (Id.)

To determine if Plaintiff had the RFC to perform other work, the ALJ considered Plaintiff's age, education, and work experience; the availability of work in the national and local economy; skill requirements; and any physical exertional restrictions. (Id. at 37.) At the time of the hearing, Plaintiff was fifty-two years old and was therefore considered an individual approaching advanced age. (Id. (citing 20 C.F.R. § 404.1563).) He had a marginal education and no transferable skills. (Id.) The ALJ applied Medical-Vocational Rule 202.11, included in Appendix 2 of Subpart P, Regulation No. 4, and concluded that Plaintiff had the RFC to perform light work.[6] (Id. at 38.)

Plaintiff appealed the ALJ's decision to the Council. (Id. at 210.) On May 20, 2002, the Council ordered that the case be remanded for a new hearing. (Id. at 211.) The Council directed the ALJ to (1) clarify whether Drs. Smith and Kalvo examined Plaintiff's 1998 MRIs before making their conclusions, (2) determine Plaintiff's mental status, (3) state specific reasons why he rejected Dr. Lambrakis's opinion despite medical evidence that could support that opinion, (4) consider Drs. Pauporte's and Buonocore's conclusions that Plaintiff had reaching

---

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

18

limitations, and (5) evaluate new evidence submitted by Dr. Lambrakis in a medical source statement dated February 19, 2002. (Id. at 212-13.) On remand, the Council directed the ALJ to call an orthopedic medical expert to testify about the nature and severity of Plaintiff's impairments and a vocation expert to testify as to the effect that any potential impairments have on Plaintiff's occupational base. (Id. at 213-14.)

On February 24, 2004, the ALJ again denied Plaintiff's application for disability benefits. (Id. at 9.) The ALJ noted all of Plaintiff's evidence from the prior hearing as well as additional medical evidence, including the 2001 MRIs, new reports from Dr. Lambrakis, and consultative examinations by Drs. Moreano, Kurzner, Karlan, and Delidimitropulu. (Id. at 18.) In determining Plaintiff's RFC, ALJ Nisnewitz gave "great weight" to Dr. Abeles's analysis of Plaintiff's medical records. (Id. at 20.) The ALJ once again rejected Dr. Lambrakis's assessment, finding that it was inconsistent with the overall record. (Id.) He also wrote that Plaintiff's subjective complaints were inconsistent with the objective medical evidence and Plaintiff's own testimony and were therefore not credible. (Id.) Based on Plaintiff's lack of exertional and non-exertional limitations, the ALJ again concluded that he could perform light work based on Medical-Vocational Rule 202.11. Id. at 21. Further, a vocational expert testified about specific jobs that somebody with Plaintiff's age, education, skill level, and RFC could perform. (Id. at 22.) Those jobs included masker, process inspector, assembly inspector, assembler, optical goods inspector, jewelry inspector, and clock and watch inspector, each of which was classified as either light or sedentary work and existed in the national and local economy in significant numbers. (Id.) Based on this evidence, ALJ Nisnewitz concluded that

Plaintiff was capable of performing substantial gainful activity and was therefore not disabled. (Id.)

Plaintiff appealed this decision to the Council, which affirmed ALJ Nisnewitz's decision on August 2, 2005. (Id. at 5.)

### C. Plaintiff's Claims

#### 1. Development of the Record

Plaintiff claims that the ALJ failed to adequately develop the record. (Pl. Br. at 21.) Due to the non-adversarial nature of a disability benefits hearing, the ALJ has an affirmative duty to develop the administrative record, even when Plaintiff is represented by an attorney. Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996). The ALJ has an obligation to develop a claimant's complete medical history by obtaining records from claimant's own medical sources. 20 C.F.R § 404.1512(d). The Second Circuit has held that failure to obtain a complete medical record before weighing the evidence constitutes reversible legal error. Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999); see also Pratts v. Chater, 94 F.3d 34, 38 (2d Cir. 1996) (holding that an ALJ who based his findings on the opinion of a medical expert who had not examined the claimant and was presented with an incomplete medical record has erred as a matter of law).

While this case involves an extensive medical record, the ALJ or the medical expert did not consider the evaluation of Dr. Zenetos, one of Plaintiff's treating physicians. Further, there is no evidence that Plaintiff ever underwent MRIs of his knees, as requested by Drs. Lambrakis and Zenetos, and the Council. (Rec. at 179, 301, 213-14.) The ALJ gave great weight to Dr. Abeles's testimony at the hearing held on December 15, 2003. (Id. at 20.) At that hearing, however, it appeared that Dr. Abeles did not review Plaintiff's actual test results and MRIs, but

rather relied on the conclusions reached by examining physicians. (Id. at 394-98.) Based on Dr. Abeles's testimony, it appears he reviewed only the 1998 MRIs and not the MRIs from 2001. (Id.) In light of Dr. Abeles's cursory examination of an incomplete version of Plaintiff's medical history, it was not proper for ALJ Nisnewitz to place so much reliance on his opinions, especially when there was an extensive record of treating and examining physician opinions. By failing to obtain MRIs of Plaintiff's knees and accepting Dr. Abeles's opinion, which was based on incomplete information, the ALJ did not fulfill his duty to complete the record. That is a legal error.

### 2.    Treating Physician Rule

Plaintiff also claims that the ALJ improperly discounted Dr. Lambrakis's opinion in contravention of the well established treating physician rule. Pl. Br. at 22.) That rule provides that special evidentiary weight must be accorded to the opinions of treating physicians. 20 C.F.R. § 404.1527(d). Specifically, more weight must be given to opinions from treating sources than from other medical sources. Id. If a treating source opinion is well supported by medically acceptable techniques and is not inconsistent with other substantial evidence, it will be given controlling weight. Id. § 404.1527(d)(2); see also Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1996). An ALJ may not, as a matter of law, reject the opinion of a treating physician simply because the treating source records are incomplete. Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir. 1998.)

Even when an ALJ finds that a treating physician opinion is contradicted by substantial evidence, the opinion is nonetheless "entitled to some extra weight because the treating physician is usually more familiar with a claimant's medical condition than other physicians."

Wagner v. Sec'y Health & Human Servs., 906 F.2d 856, 861 (2d Cir. 1990). If the opinion of a treating physician is not given controlling weight, the ALJ must apply various factors to determine how much weight it is entitled to receive. Castero v. Barnhart, 309 F. Supp. 2d 435, 444 (E.D.N.Y. 2004). In making this determination the ALJ must consider "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." Clark, 143 F.3d at 118 (citing 20 C.F.R. § 404.1527(d)). When the ALJ chooses not to give the treating physician's opinion controlling weight, he must give "good reasons in his notice . . . for the weight he gives [to the] treating source's opinion."[7] Id. Conversely, the opinion of a consulting physician "should be given limited weight . . . [because] consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990).

While there is some evidence in the record to support the ALJ's rejection of Dr. Lambrakis's opinion, the ALJ did not articulate "good reasons" for that rejection or demonstrate that it was based on substantial evidence as required by the regulations. (Rec. at 20.) The record shows that the consultative doctors who examined Plaintiff determined that he had virtually no limitations. (Id.) However, Drs. Khattak, Smith, Falvo, Kurzner, and Karlan examined Plaintiff

---

[7] "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even -- and perhaps especially -- when those dispositions are unfavorable. A claimant . . . who knows that her physician has deemed her disabled, might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999).

only once each, and Dr. Karlan noted that Plaintiff had several abnormal test results. (Id. at 118.
187, 191, 271, 283.) Further, ALJ Nisnewitz did not mention what weight he afforded to Dr.
Gifford's diagnosis and failed to consider the opinions of Drs. Giannaris or Zenetos in reaching
his decision. (Id. at 15.)

Dr. Lambrakis examined Plaintiff at least fifteen separate times in a four year period. (Id.
at 78, 105, 144, 177, 182, 179, 185, 263, 250, 243, 246, 309, 308, 306, 304, 302, 312.) In
determining how much weight to give Dr. Lambrakis's opinion, the ALJ ignored this extensive
history of treatment. He also failed to explain why he did not credit the opinions of Drs.
Zenetos, Giannaris, and Gifford, other treating physicians whose conclusions were similar to Dr.
Lambrakis's. Further, the ALJ did not explain why he rejected Dr. Lambrakis's reading of
Plaintiff's 1998 and 2001 MRIs.

The ALJ did not follow the Council's previous order to attempt to reconcile the widely
divergent opinions of Dr. Lambrakis and the consulting physicians. (Id. at 213-14.) The record
does not show that the ALJ attempted to re-contact Dr. Lambrakis in order for him to explain his
findings.[8] Further, the ALJ does not address Plaintiff's claim that the consulting physicians did
not thoroughly examine him. (Id. at 309.) While the record does not overwhelmingly support a
conclusion that Dr. Lambrakis's findings are entirely credible, the ALJ did not support his

---

[8] Dr. Lambrakis has provided significant amounts of information, gathered over a long period of
time, regarding Plaintiff. When the evidence received from treating sources is inadequate or
unclear, the ALJ must try to re-contact treating physicians or other medical sources to determine
if other information is available. 20 C.F.R § 404.1512(e)(1). An ALJ is not required to attempt
to re-contact a treating physician for "additional evidence or clarification when it is known from
past experience that the source either cannot or will not provide the necessary finding[s]." Id. §
404.1512(e)(2); see also Hill v. Barnhart, 410 F. Supp. 2d 195, 208 (S.D.N.Y. 2006). If upon re-
contact Dr. Lambrakis once again insisted that the reason for the divergent opinions was that all
the consulting physicians made reporting errors, then the ALJ might have had a basis for
discounting Dr. Lambrakis's opinion. (See Rec. at 309-10.)

contrary conclusion with affirmative evidence. (Id. at 20.) He was obligated to do so. Rosa, 168 F.3d at 81 (holding that the Commissioner must present affirmative evidence to sustain his burden of proof). In light of the lengthy history of treatment by Dr. Lambrakis, the ALJ has not shown that there was substantial evidence in the record to reject Dr. Lambrakis's findings and has not stated a good reason for doing so.

### 3. Subjective Pain Evidence

The Commissioner is not obligated to accept a claimant's testimony about his own symptoms. Kendall v. Apfel, 15 F. Supp. 2d 262, 267 (E.D.N.Y. 1998). When a plaintiff's symptoms suggest a greater functional restriction than can be determined by objective evidence alone, consideration will be given to other factors. 20 C.F.R. § 404.1529(c)(3); see also Taylor v. Barnhart, No. 03-6072, 2003 U.S. App. LEXIS 23805, at *5 (2d Cir. Nov. 21, 2003).

In both administrative hearings, the ALJ concluded that Plaintiff's subjective pain testimony was inconsistent with objective medical evidence and therefore was not credible. (Rec. at 36, 20.) Because the ALJ incorrectly dismissed the treating source opinion of Dr. Lambrakis, he improperly dismissed Plaintiff's subjective complaints as being inconsistent with the objective medical evidence.[9]

### 4. Residual Functional Capacity

Based on his assessment of Plaintiff's RFC and the testimony of the vocational expert, the ALJ concluded that the Plaintiff was able to perform light work. (Rec. at 23.) To properly rely on a vocational expert's testimony, an ALJ must "pose hypothetical questions . . . which

---

[9] The record does illustrate that Plaintiff's complaints are not consistent with the findings of Drs. Falvo, Khattak, Kurzner, Moreano, and Karlan. With a complete record, thorough explanation of the reasons for rejecting Dr. Lambrakis's opinion, and further analysis of the opinions of Drs. Giannaris, Gifford, and Zenetos, it may be possible to conclude that Plaintiff's subjective testimony is inconsistent with the objective medical evidence and not credible.

reflect the full extent of the claimant's capabilities and impairments [in order] to provide a sound basis for the [expert]'s testimony." See Jehn v. Barnhart, 408 F. Supp. 2d 127, 135 (E.D.N.Y. 2006) (citing De Leon v. Sec'y of Health and Human Servs., 734 F.2d 930, 936 (2d Cir. 1984)).

Based on his assessment of Plaintiff's RFC, ALJ Nisnewitz posed hypotheticals to the vocational expert, who was able to identify several jobs that someone who fit the Plaintiff's description could perform. (Rec. at 22.) The vocational expert, however, also testified that if Dr. Lambrakis's opinion was correct then Plaintiff would be unable to perform any light or sedentary work. (Id. at 418.)

## III. Conclusion

The ALJ did not consider the entire record, nor did he provide good reasons for the weight he gave to Plaintiff's treating physician opinion. The Commissioner's motion for judgment on the pleadings is therefore DENIED. Plaintiff's motion is GRANTED and the case is REMANDED for a hearing at which the ALJ shall fully develop the record, adequately consider all of the medical evidence in accordance with 20 C.F.R. §§ 404.1512 (d), 404.1520(a)(3), and provide good reasoning for affording limited weight to the treating physician's findings in accordance with Section 404.1527(d).


/signed/

Dated: July 2⁴, 2007          _____
      Brooklyn, N.Y.          NICHOLAS G. GARAUFIS
                                       United States District Judge